Marathon v. Pitzner



NUMBER 13-98-098-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

____________________________________________________________________


MARATHON CORPORATION D/B/A HONDA-SUZUKI NORTH, Appellant,


v.


JOHN PITZNER, A MENTALLY INCOMPETENT PERSON BY AND THROUGH HIS NEXT FRIEND

AND GUARDIAN, STEVEN PITZNER, Appellee.

____________________________________________________________________


On appeal from the 370th District Court of Hidalgo County, Texas.

____________________________________________________________________


O P I N I O N

Before Justices Hinojosa, Yañez, and Rodriguez

Opinion by Justice Hinojosa

John C. Pitzner ("Pitzner"), a Dallas County resident, was working for Professional Employers Group, Inc. ("PEG"), a
Texas corporation that supplied temporary employees, when he was sent out on an air conditioner repair job on Monday,
July 18, 1994, for Environmental Comfort Systems, Inc. d/b/a Country Refrigeration ("ECSI"), a Texas corporation owned
by Robert S. "Country" Hull ("Hull"), a Carrollton, Texas resident. Pitzner was asked to repair an air conditioning unit
manufactured by York International Corporation ("York"), a Delaware corporation. The unit was located on the roof of
Marathon Corporation, a Texas corporation, d/b/a Honda-Suzuki North ("Marathon" or "appellant"), a motorcycle
dealership in Dallas. Pitzner was working alone on the roof when the dealership closed at 6:00 p.m. and its employees left.
Approximately two hours later, he was found lying semiconscious on the ground next to the Marathon building, bleeding
profusely from his left ear. Pitzner had fallen from the roof and sustained severe head trauma. A screwdriver with a burnt
tip was found lying nearby. Pitzner's injuries prevented him from explaining what caused him to fall from the roof. He
underwent emergency surgical removal of portions of the frontal and temporal lobes of his brain, leaving him seriously and
permanently disabled.

Appellee, Steven Pitzner, became Pitzner's guardian and filed a personal injury action in the 370th District Court of
Hidalgo County. Appellee asserted products liability, premises liability, and negligence causes of action against ECSI,
Hull, PEG, York and Marathon. Appellee alleged that, while working on the unit, Pitzner received an electrical shock that
caused him to fall backwards, trip over an improperly placed natural gas line and fall more than twelve feet to the concrete
below. Appellee also alleged that the air conditioning unit was placed too close to another unit and did not have a
disconnect switch, in violation of Dallas City Code ordinances (Chapter 55 of the Dallas Mechanical Code and Chapter 56
of the Dallas Electrical Code). ECSI, PEG, Hull and York eventually settled appellee's claims against them. Marathon
was the sole defendant to go to trial. A jury found Marathon one hundred percent liable for Pitzner's injuries, and found
that Pitzner's actual damages were in the amount of $5,945,500.00. The trial court signed a judgment for actual damages of
$5,945,500.00, prejudgment interest of $1,785,652.50, and costs. This appeal ensued.

A. Appellate Issues

On appeal, Marathon presents the following issues: 

Issue 1: Whether the evidence is legally and factually sufficient to show that Marathon owed a duty to Pitzner;

Issue 2: Whether appellee "failed to prove" that Marathon had any right of control over Pitzner's work and failed to request
and obtain a jury finding regarding who had the right of control; 

Issue 3: Whether the evidence is legally and factually sufficient to show that Marathon had actual or constructive
knowledge of a dangerous condition on the premises, that a condition on the premises posed an unreasonable risk or harm,
or that Marathon did not exercise reasonable care to reduce or eliminate the risk;

Issue 4: Whether the evidence is legally and factually sufficient to show that Marathon's negligence, if any, proximately
caused Pitzner's injuries;

Issue 5: Whether the evidence is legally and factually sufficient to show that Marathon was solely responsible for Pitzner's injuries;

Issue 6: Whether the trial court abused its discretion by failing to transfer the case to Dallas County;

Issue 7: Whether the trial court abused its discretion by refusing to allow cross-examination concerning an OSHA citation
and penalty issued against Pitzner's employer;

Issue 8: Whether the trial court abused its discretion by allowing appellee to present evidence of improvements made over a
year after the incident; 

Issue 9: Whether the trial court erred in granting a judgment for lost wages because such an award was not supported by the
pleadings;

Issue 10: Whether the trial court abused its discretion by refusing to allow an offset for settlement credits; and 

Issue 11: Whether the trial court erred in calculating prejudgment interest.

B. Jurisdiction and Preservation of Issues

Appellee has filed a motion to dismiss, asserting that this Court has no subject matter jurisdiction to hear this appeal
because Marathon failed to timely pay the filing fee for its motion for new trial. In the alternative, appellee argues that
Marathon has failed to preserve error as to those issues which must be preserved by filing a motion for new trial.

According to the record, the judgment was signed on January 23, 1998, and Marathon timely filed its motion for new trial
on February 23, 1998. However, Marathon did not pay the required $15 filing fee. See Tex. Gov't Code Ann. §
51.317(a)(2) (Vernon 1998). The motion for new trial was not acted on by the trial court and was, therefore, overruled by
operation of law seventy-five days later. Tex. R. Civ. P. 329b(c). Marathon eventually paid the filing fee for the motion
for new trial on August 3, 1999, long after the trial court lost jurisdiction over the case and just four days after appellee
filed his motion to dismiss. We must now determine the effect of the late payment of that filing fee.

The Texas Supreme Court has held that the timely filing of a motion for new trial, even with late payment of the correct
filing fee, is sufficient to extend the appellate timetables. Tate v. E.I. DuPont de Nemours & Co., 934 S.W.2d 83, 84 (Tex.
1996); Jamar v. Patterson, 868 S.W.2d 318, 319 (Tex. 1993). However, the timeliness of this appeal is not at issue in this
case because Marathon did not rely on the motion for new trial to extend the appellate timetable; it timely filed its notice of
appeal on February 23, 1998.

More troublesome is the effect of Marathon's late payment of the filing fee on the preservation of some of its appellate
issues. A motion for new trial is a prerequisite to a complaint on appeal: (1) of factual insufficiency; (2) that a jury finding
is against the overwhelming weight of the evidence; and (3) of excessiveness of damages found by the jury. Tex. R. Civ. P.
324(b). These complaints have been raised by Marathon in issues one, two, three, four, five and nine. We must now
determine whether Marathon has preserved these complaints for appellate review.

In Jamar, the Supreme Court "acknowledg[ed] two effects to filing a motion for new trial: (1) presenting the motion to the
trial court in order to secure a ruling; and (2) extending the appellate timetable." Spellman v. Hoang, 887 S.W.2d 480, 482
(Tex. App.-San Antonio 1994, no writ) (citing Jamar, 868 S.W.2d at 319). The appellant in Jamar "tendered" his motion
to the district clerk, who did not "accept" it because the filing fee was not paid. Jamar, 868 S.W.2d at 318. The motion
was not stamped "filed" by the clerk until the appellant returned with the filing fee eighteen days later. Id. The Supreme
Court held that a motion for new trial is "conditionally filed" when tendered to the clerk. Id. at 319. However, in a
footnote, the court stated, "[t]he filing is not completed until the fee is paid, and absent emergency or other rare
circumstances, the court should not consider [the motion] before then." Id. at 319 n.3.

In Tate, the appellant timely presented her motion for new trial to the district court, but did not pay the filing fee until after
the motion had been overruled by operation of law, but while the trial court still had plenary jurisdiction. Tate, 934 S.W.2d
at 83. The Supreme Court held that late payment of the filing fee at this time was sufficient to extend the appellate
timetables, but specifically "express[ed] no opinion about whether a motion for new trial, even though extending the
appellate timetable, properly preserves error for appeal if, as in this case, the filing fee is not paid until after the motion is
overruled by operation of law." Id. at 84 n.1.

Other courts have suggested that a trial court has no authority to hear a motion for new trial before the filing fee has been
paid. See Finley v. J.C. Pace Ltd., 4 S.W.3d 319, 321 (Tex. App.-Houston [1st Dist.] 1999, no pet.) (where appellant never
paid filing fee); Polley v. Odom, 937 S.W.2d 623, 625-26 (Tex. App.-Waco 1997, no writ) (where appellant did not pay
filing fee until after trial court lost plenary jurisdiction); Spellman, 887 S.W.2d at 482 (where filing fee was not paid until
brought to appellants' attention by appellees some seven months after motion was heard and denied by trial court).

In a case very similar to this case, where the filing fee for a motion for new trial was not paid until after the trial court had
lost plenary jurisdiction, this Court held that while filing a motion for new trial without payment of the filing fee does not
affect the appellate timetable, it 

does affect the trial court's discretion to hear and determine the motion. If the movant fails to pay the required fee, the trial
court should refuse to consider the motion, as suggested by Jamar. While this may then amount to a waiver of the specific
grounds raised in the motion for new trial, we do not believe that it should retroactively invalidate the filing of that motion
for purposes of the appellate deadlines and appellate court jurisdiction.

Ramirez v. Get "N" Go #103, 888 S.W.2d 29, 31 (Tex. App.-Corpus Christi 1994, writ denied). In a footnote, we
specifically stated that we were not addressing the issue of whether failure to timely pay the required filing fee results in the
lack of preservation of any appellate issues. Id. at 31 n.1.

In Kvanvig v. Garcia, 928 S.W.2d 777, 778 (Tex. App.-Corpus Christi 1996, orig. proceeding), the defendant failed to pay
the filing fee until nearly three months after the trial court timely granted her motion for new trial. The plaintiff, who did
not object to the lack of payment of the filing fee, or otherwise object in the trial court, then sought a writ of prohibition to
prevent the trial judge from granting the new trial on the ground that the trial court had no authority to grant a motion for
new trial filed without payment of the proper fee. In denying the petition for writ of prohibition, this Court held that:

[u]pon a sufficient showing of nonpayment, the trial court has discretion to refuse to act upon a motion for new trial until
the filing fee is paid. Nevertheless, though it may have no obligation until the fee is paid, we conclude that the trial court in
its discretion may consider and rule upon a motion for new trial from the time that it is tendered to the clerk and
"conditionally filed." 

Id. at 779. However, Kvanvig did not address the effect of the late payment of the filing fee on the preservation of issues on
direct appeal.

We conclude that the reasoning of Jamar, Tate, Finley, Ramirez, Polley and Spellman apply to the instant case, where the
appellant failed to pay the filing fee for its motion for new trial until long after the motion was overruled by operation of
law and the trial court lost plenary jurisdiction. (1) We hold that appellant has failed to preserve error as to those issues
which must be preserved for appellate review by a point raised in a motion for new trial.

Accordingly, appellant's factual sufficiency claims, raised in issues one, two, three, four and five, are overruled. See Tex.
R. Civ. P. 324(b). Appellant's claim of an excessive damages award, raised in issue nine, is also overruled. See Id. We
will now review appellant's remaining issues.

C. Legal Sufficiency of the Evidence

1. Standard of Review

Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first
address those points that would afford the party the greatest relief. Bradleys' Electric, Inc. v. Cigna Lloyds Ins. Co., 995
S.W.2d 675, 677 (Tex. 1999); see CMH Homes, Inc. v. Daenen, 15 S.W.3d 97, 99 (Tex. 2000) (determining legal
sufficiency points before reaching a venue question). The remedy for legal insufficiency is a rendition in favor of the
appellant, and the remedy for an error in the determination of proper venue is a remand. Daenen, 15 S.W.3d at 99.
Therefore, we will address appellant's legal sufficiency issues first.

The jury is the sole judge of the credibility of witnesses and is entitled to accept or reject any testimony it wishes, as well as
to decide what weight to give the testimony. Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 549 (Tex. 1962); ONI, Inc.
v. Swift, 990 S.W.2d 500, 502 (Tex. App.-Austin 1999, no writ).

Legal sufficiency issues are addressed as either "no evidence" or "matter of law" issues. Minyard Food Stores, Inc. v.
Goodman, 2001 Tex. App. LEXIS 4254, *4 (Tex. App.-Fort Worth June 28, 2001, no pet. h.); Gooch v. Amer. Sling Co.,
902 S.W.2d 181, 183 (Tex. App.-Fort Worth 1995, no writ). When the complaining party on appeal did not have the
burden of proof at trial, we address the error as a "no evidence" point. Minyard Food Stores, 2001 Tex. App. LEXIS at
*4;Gooch, 902 S.W.2d at 183-84. When the complaining party on appeal did have the burden of proof, we address the
issue as a "matter of law" challenge. Dow Chem. Co. v. Francis, 2001 Tex. LEXIS 37, *10, 46 S.W.3d 237, --- (Tex.
2001); Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). In the instant case, appellant claims the evidence is
insufficient as to issues on which appellee had the burden of proof at trial.

When the appellant challenges the legal sufficiency of the evidence to support a finding on which it did not have the burden
of proof at trial, the appellant must demonstrate on appeal that no evidence exists to support the adverse finding. Croucher
v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); II Deerfield Ltd. Partnership v. Henry Bldg, Inc., 41 S.W.3d 259, 264 (Tex.
App.-San Antonio 2001, pet. denied); Casino Magic Corp. v. King, 43 S.W.3d 14, 19 (Tex. App.-Dallas 2001, no
pet.);Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.-Austin 1992, no writ). In the
instant case, appellant did not have the burden of proof as to the issue of which he complains the evidence is insufficient.

When we review a "no-evidence" issue, we must view the evidence in a light that tends to support the finding of the
disputed fact and disregard all inferences to the contrary. Bradford, 2001 Tex. LEXIS 35, at *9; Weirich v. Weirich, 833
S.W.2d 942, 945 (Tex. 1992); Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex. 1988); see Formosa Plastics Corp.
USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998); Hines v. Comm'n for Lawyer Discipline, 28
S.W.3d 697, 701 (Tex. App.-Corpus Christi, no pet.). A legal sufficiency point must and may only be sustained when the
record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence
from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no
more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact. Juliette Fowler
Homes, Inc. v. Welch Assoc., 793 S.W.2d 660, 666 n. 9 (Tex. 1990). If there is more than a scintilla of evidence to support
the finding, the legal sufficiency challenge fails. Formosa Plastics, 960 S.W.2d at 48; Stafford v. Stafford, 726 S.W.2d 14,
16 (Tex. 1987).

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. Kindred v. Con-Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983); II Deerfield Ltd., 41 S.W.3d at 264. The test for the application of this no evidence/scintilla
rule is: if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital
fact lacks probative force and will be held to be the legal equivalent of no evidence. Id.

2. Evidence Adduced at Trial

It is undisputed that there were two air conditioning units on the dealership roof, spaced about twelve inches apart, fairly
near the roof edge. A two-inch natural gas line ran between the units and the roof edge, approximately twenty-nine inches
from the edge. The gas line was positioned about five inches above the roof. The top of the roof was approximately twelve
feet, ten inches from the ground. 

According to Jesse Leos, the Honda-Suzuki store manager, the thermostat for the air conditioning system was inside the
building. Hull had serviced the company's air conditioning units since 1982. Usually, a Marathon employee would stay
until the serviceman completed his work. Pitzner had worked on the units many times, and although he would usually let
Marathon personnel know if he had to stay or if he needed access to the building, he did not say anything to that effect on
the day of the accident. Leos and the service manager were the last ones to leave that day. They knew Pitzner was on the
roof, but did not tell him they were leaving.

William Bowman, president of Marathon Corporation, testified that the Honda-Suzuki motorcycle dealership is a corporate
asset of Marathon, and that he personally owns the building in which the dealership is located. Marathon leased the
building from a third party from 1979 until Bowman bought it in 1991. The dealership is open from 9:00 a.m. to 6:00 p.m.
Monday through Friday, and on Saturdays from 9:00 a.m. to 5:00 p.m. Bowman testified that Hull did the air conditioning
work on the building dating back to at least 1984, perhaps as far back as 1979. Bowman had "no reason to doubt" that Hull
was complying with all applicable codes and statutes. He felt there was nothing Marathon could have done to prevent
Pitzner's accident. 

Dallas Police Detective Paul Lachnitt testified that on the evening of July 18, 1994, Pitzner was found semiconscious on
the ground beside the Honda-Suzuki building, covered in blood. His work truck was still in the parking lot. No ladder was
found at the site. There was no indication of a robbery, and in Lachnitt's opinion, Pitzner was not the victim of an assault.

Hull testified that he began doing commercial air conditioning work in 1977 or 1978. He incorporated his business as
ECSI in 1982. Pitzner was his first employee in late 1991. Hull denied installing the units on top of the Honda-Suzuki
building, and testified that he always put disconnect switches in new units he installed. Hull further testified that Pitzner
had been on the roof of that building some twenty-five to fifty times, and that he had never reported anything dangerous on
the roof. Hull himself never saw anything up there he considered dangerous, except an overhang over the front door that
was not involved in this accident. Hull installed new units on the Honda-Suzuki roof in 1994 or 1995.

Hull said that it is common for air conditioning repairmen to use a screwdriver to "short across" to turn the unit on and off.
Pitzner did not have access to the "on/off" switch because it was inside the building, which was closed for the evening. To
charge an air conditioning unit with Freon fully, it is necessary to turn it on. Hull says all Pitzner had to do to start the unit
was to connect the two blue low-voltage (24 volt) wires.

Roger Davidson, Sr., appellee's expert, worked for twenty-seven years as a Dallas city building inspector. He investigated
the manufacture dates of the units using their serial number, and discovered that, contrary to Hull's assertion that the units
were there when he began doing Marathon's air conditioning service in 1982, the units were installed in mid-1985 or early
1986. 

The purpose of the Dallas City building codes is to protect the safety and welfare of anyone who comes into a building,
including servicemen such as Pitzner. The code specifically makes the owner or lessee of a building responsible for
ensuring that all proper permits are obtained. A permit is required for installation of new air conditioning units and costs
about $46. City records show that a permit was never obtained for the installation of the units Pitzner was working on, or
for the installation of the newer units in 1995.

Davidson viewed the roof in April 1995, and opined that there were major violations. City codes and ordinances require:
(1) a thirty-inch work space in front of the access panel on an air conditioning unit; (2) an electrical disconnect on or near
the unit; (3) a 120-volt power outlet within twenty-five feet of the equipment for service and maintenance purposes; (4) a
thirty-six inch work space in front of electrical equipment such as an air conditioning unit; (5) electrical wires installed in a
continuous circuit; (6) support braces made of a non-combustible material (not wood); (7) a permit to install an air
conditioning unit; and (8) a permit to install a gas line. Davidson found violations of all of these provisions on the rooftop
of the Honda-Suzuki building.

The city codes and ordinances were enacted to ensure the safety of servicemen. If a permit had been obtained, a city
inspector would have inspected the rooftop and required Marathon to fix all the violations. If Bowman or Leos had
inspected the area where the units were installed, it would have been obvious that no permit was displayed as required by
law. 

Davidson further opined that the new units Hull installed in 1995 were also in violation of the code because: (1) the
electrical wiring has disjointed joints; (2) the gas line has more than three feet of flexible appliance connector; (3) the
condensation drains just pour off the roof instead of draining into the sewer; (4) the units have no disconnect switch; (5)
there is no 120 volt power outlet; (6) the electric wiring for the units is too long, up to fifty feet instead of the six feet
allowed; and (7) no permit was issued.

Davidson disagreed with Hull's contention that Pitzner could not have come into contact with a high voltage line. He said
it is not possible to turn the unit on by simply connecting the two low-voltage wires if the downstairs on/off switch was off.
The transformer to operate the low-voltage wires is in the downstairs unit. Without access to the on/off switch, the only
way Pitzner could turn the unit on and off to fully charge it with freon was to use a screwdriver to reach into the access
panel and push the contactor, which bypasses the control circuit and activates the unit. It is very common for servicemen to
do this. However, this could result in an electrical shock or flash.

In Texas, only air conditioning contractors are required to be licensed, not technicians such as Pitzner. Nowhere on the
Honda-Suzuki roof could a person attach a safety belt.

Dr. John Eftekhar, appellee's expert, is a professor of mechanical engineering at the University of Texas at San Antonio. He
teaches air conditioning system design and also has an accident reconstruction business. After viewing photographs of the
roof, taken just after the accident, Eftekhar opined that at the time of the accident, Pitzner was working on the condensing
unit in the small space between the units, repairing a freon leak. The photos show that the space between the units and the
roof edge was "crowded" with gas pipes, vents and electrical cables. A serviceman must get between the units to access the
control panel.

The unit must be turned on in order to get a full freon charge. The contactor is a relay that gets a signal from the thermostat
inside the building to turn the cooling unit on or off. By pushing the contactor, the circuit is completed, causing the
compressor to run. The system works off a high-voltage line (220 volts), which powers the unit, and a low-voltage line (24
volts), which powers the control. (2) The unit did not have a power disconnect. There is evidence in the photos of an
electrical flash -- some dark spots near the contactor. 

Eftekhar opined that the injuries to Pitzner's skull and his lumbar spine show that Pitzner was traveling backwards when he
left the roof, and that his upper body struck the ground first. (3) Using photos of the accident scene showing the pool of
blood where Pitzner landed, actual measurements from the scene, Pitzner's height, weight, and the size of his arm, neck and
head, Eftekhar calculated Pitzner's center of gravity, and was able to determine the range of speed when he exited the roof
as 3 to 3.1 feet per second, comparable to a fast walk. He opined that Pitzner most probably received an electrical shock or
"a sensation that surprised him," causing him to reel backward, trip over the gas line and fall off the roof. 

The small space between the units did not comply with the city code and was a contributing factor in the accident. The
space was too crowded. Most probably, Pitzner was standing between all the parts, vents, pipes and cords, trying to reach
in the unit when he was shocked.

Carlton Skaggs, appellant's expert, has a degree in industrial education and is a former insurance company investigator.
Skaggs opined that neither Marathon nor Honda did anything wrong to cause or contribute to this accident. His opinion
was based on photographs of the accident scene, and that the company had been there since 1969 and Pitzner had worked
on the air conditioning units many times. Skaggs testified that he is not familiar with Dallas city building codes, the
Uniform Mechanical Code or the Uniform Plumbing Code. He further opined that Pitzner could have fallen off the roof
due to heat stroke.

3. Premises Liability

a. Standards

Premises liability law establishes the duties owed by an owner or occupier of land to persons who come onto the property
to protect them from injury on account of dangerous conditions or activities on the property. The elements of a premises
liability action are:

(1) actual or constructive knowledge of a condition on the premises by the owner or occupier;

(2) that the condition posed an unreasonable risk of harm;

(3) failure by the owner or occupier to use reasonable care to reduce or eliminate the risk; and

(4) that the failure by the owner or occupier to use such care proximately caused the plaintiff's injuries. Daenen, 15 S.W.3d
at 99; Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex. 1998); Keetch v. Kroger Co., 845 S.W.2d 262, 264
(Tex. 1992); see also Restatement (Second) of Torts § 343 (1965). The extent of duty owed by an owner or occupier of
land to entrants on the property depends on the status of the entrant as a trespasser (whose presence on the property is
unauthorized), a licensee (one who comes onto the property with permission, but for his own purposes rather than a
purpose that mutually benefits the owner or occupier and the entrant), or an invitee (who is expressly invited onto the
property for the mutual benefit of the owner or occupier and the entrant). See, e.g., Mellon Mortgage Co. v. Holder, 5
S.W.3d 654, 655 (Tex. 1999).

Pitzner, a repairman sent in response to Marathon's call for air conditioning repair service, was clearly an invitee. The duty
owed to an invitee is to exercise reasonable care to protect him against danger from a condition on the land that creates an
unreasonable risk of harm of which the owner or occupier knew or by the exercise of reasonable care would discover.
Daenen, 15 S.W.3d at 101; Corbin v. Safeway Stores, Inc., 648 S.W.2d 292, 295 (Tex. 1983). 

In this case, appellee asserts Pitzner's injury arose from several premises defects: (1) unsafe placement of the two air
conditioning units too close together; (2) unsafe placement of the units too close to the edge of the roof; (3) unsafe
placement of a natural gas line; and (4) the lack of an on/off switch on the units. Generally, an owner or occupier of land
does not owe any duty to ensure that an independent contractor performs his work in a safe manner. Hoechst-Celanese
Corp. v. Mendez, 967 S.W.2d 354, 356 (Tex. 1998). However, a premises owner or occupier may be directly liable to an
independent contractor's employees for two types of negligence in failing to keep the premises safe: (1) negligence
pertaining to defects existing on the premises when the independent contractor/invitee entered; and (2) negligence arising
from activity on the premises. Coastal Marine Serv. of Tex., Inc. v. Lawrence, 988 S.W.2d 223, 225 (Tex. 1999); Clayton
W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997).

Under the first subcategory, the premises owner has a duty to inspect the premises and warn the independent
contractor/invitee of dangerous conditions that are not open and obvious and that the owner knows or should have known
exist. Lawrence, 988 S.W.2d at 225; Olivo, 952 S.W.2d at 527-28; Shell Chem. Co. v. Lamb, 493 S.W.2d 742, 746 (Tex.
1973). The core of the duty depends on actual or constructive knowledge of a dangerous condition that a reasonable
inspection would reveal. Daenen, 15 S.W.3d at 101; Seideneck v. Cal Bayreuther Assocs., 452 S.W.2d 752, 754 (Tex.
1970). Premises defects of this type are ones in which the danger did not arise through the work activity of the
subcontractor/invitee. Lawrence, 988 S.W.2d at 225; Lamb, 493 S.W.2d at 746; Smith v. Henger, 148 Tex. 456, 226
S.W.2d 425, 433 (Tex. 1950). Only concealed hazards - those dangerous in their own right and independent of action by
another - that are in existence when the independent contractor enters the premises fall into this first subcategory of
premises defects. Lawrence, 988 S.W.2d at 225 (holding the pinch point area of a crane in which a worker's head was
crushed posed no danger until put into operation, and thus, could not be considered under the first subcategory of premises
defect liability); Smith, 226 S.W.2d at 433 (holding that an open shaft with inadequate warnings when contractors entered
the property was a defect under the first subcategory). The occupier is considered to have constructive knowledge of any
premises defects that would be discovered in the exercise of reasonable care. Corbin, 648 S.W.2d at 295 (Tex. 1983).
Furthermore, if an owner or occupier has breached a statute or ordinance that was designed to prevent injury to the class of
persons to which the injured party belongs, the owner or occupier is considered negligent per se. Nixon v. Mr. Property
Management Co., 690 S.W.2d 546, 549 (Tex. 1985). An invitee is not required to prove that he did not know of the
dangerous condition. State Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 237 (Tex. 1992). 

Under the second subcategory - when the dangerous condition arises as a result of the independent contractor's work
activity - the premises owner normally owes no duty to the independent contractor's employees because an owner generally
has no duty to ensure that an independent contractor performs its work in a safe manner. Lawrence, 988 S.W.2d at
225;Mendez, 967 S.W.2d at 356; Olivo, 952 S.W.2d at 527-28; Abalos v. Oil Dev. Co., 544 S.W.2d 627, 631-32 (Tex.
1976). An independent contractor is considered to be in a better position to inspect, eliminate or warn persons of the danger
arising from its work than the owner or occupier of the premises. Lamb, 493 S.W.2d at 746-48. However, a premises
owner may be liable when the owner retains the right of supervisory control over work on the premises. Lawrence, 988
S.W.2d at 225-26; Olivo, 952 S.W.2d at 529; Lamb, 493 S.W.2d at 747-48; Redinger v. Living, Inc., 689 S.W.2d 415, 418
(Tex. 1985) (adopting section 414 of the Restatement (Second) of Torts, which provides:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to
liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused
by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1977). In determining whether the owner has retained control, the right to control
must be more than a general right to order work to stop and start, or to inspect progress. Lawrence, 988 S.W.2d at 226;
Redinger, 689 S.W.2d at 418. The supervisory control must relate to the activity that actually caused the injury, and grant
the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe
manner. Lawrence, 988 S.W.2d at 226; Olivo, 952 S.W.2d at 528; Redinger, 689 S.W.2d at 418. The control must relate
to, or have a nexus to, the condition or activity that caused the injury. Mendez, 967 S.W.2d at 357. In other words, the
premises owner's duty of care is commensurate with the control it retains over the independent contractor's work. Id.

A plaintiff can prove right to control in two ways: (1) by evidence of a contractual agreement which explicitly assigns the
premises owner a right to control; and (2) when there is no contractual agreement, by evidence that the premises owner
actually exercised control over the job. Lawrence, 988 S.W.2d at 226; Olivo, 952 S.W.2d at 528; Redinger, 689 S.W.2d at
418. The right to control must be more than a general right to order work to stop and start, or to inspect progress and
receive reports, or to make suggestions or recommendations that need not necessarily be followed, or to prescribe
alterations and deviations. Mendez, 967 S.W.2d at 356. Such a general right does not mean the contractor is controlled as
to the methods of work, or as to operative detail. Id. 

b. Duty and the Right to Control the Work

In its first issue, Marathon contends it owed no duty to Pitzner under the facts of this case because, under the second
subcategory of premises defects, the dangerous condition arose as a condition of Pitzner's work activity; therefore,
Marathon owed no duty to ensure that an independent contractor or its employees perform their work in a safe manner. See
Lawrence, 988 S.W.2d at 225; Mendez, 967 S.W.2d at 356; Olivo, 952 S.W.2d at 527-28; Abalos, 544 S.W.2d at 631-32.
In its second issue, Marathon contends that it had no right to control Pitzner's work.

It is well-settled that a premises owner or occupier may be liable when he retains the right of control over work on the
premises. See Lawrence, 988 S.W.2d at 225-26; Olivo, 952 S.W.2d at 529; Lamb, 493 S.W.2d at 747-48; Redinger, 689
S.W.2d at 418. In the instant case, Marathon asserted absolute control over a critical aspect of Pitzner's work - the ability to
safely turn the air conditioning condenser on and off - when Marathon's employees closed up the building and left, knowing
that Pitzner was still up on the roof working on the air conditioner. The control retained by Marathon relates to the activity
that actually caused the injury - Pitzner's attempt to operate the condenser by inserting a screwdriver into the unit in an
attempt to complete the electrical circuit - and constituted the exercise of the power to forbid the activity being done in an
unsafe manner. We note that Marathon's employees had the option of staying late, as they had done on prior occasions, to
ensure Pitzner's access to the thermostat inside the building. See Lawrence, 988 S.W.2d at 226; Olivo, 952 S.W.2d at 528;
Redinger, 689 S.W.2d at 418. Marathon's duty of care is commensurate with the control it retained over the independent
contractor's work. Because the control asserted by Marathon relates to, or has a nexus to the activity that caused the injury,
Marathon breached its duty of care toward Pitzner. We hold the evidence is legally sufficient to support the jury's findings
that Marathon owed a duty to Pitzner and that Marathon breached that duty.

In its second issue, Marathon also contends that the trial court erred in entering judgment against Marathon "because of . . .
Pitzner's failure to request and obtain a jury answer regarding who had the 'right of control'." In its brief, Marathon says
only that:

inasmuch as Pitzner failed to obtain any finding in the trial court regarding the "right of control," whether as owner of the
premises or with respect to the services Pitzner provided. . ., Pitzner waived any right to recover any damages in this
lawsuit. See, e.g., Olivo, 952 S.W.2d at 529; Keetch, 845 S.W.2d at 266; Wal-Mart Stores, Inc. v. Bazan, 966 S.W.2d 745,
747 (Tex. App.-San Antonio 1998, no writ); Wyndham Hotel Co., v. Self, 893 S.W.2d 630, 635 (Tex. App.-Corpus Christi
1994, writ denied).

It is well-settled that to preserve error in the charge, a party must make a request, no matter who has the burden of proof on
the issue, when the party maintains the trial court has incorrectly omitted an instruction or definition.

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any
complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived
unless specifically included in the objections.

Tex. R. Civ. P. 274. Furthermore, 

[f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in
substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment;
provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the
opposing party.

Tex. R. Civ. P. 278; see Payne, 838 S.W.2d at 241 ("There should be but one test for determining if a party has preserved
error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and
obtained a ruling.").

Marathon has not shown that it objected to the omission of a question or instruction relating to the right of control, or that it
submitted such a question or instruction to the trial court, and we find none in the record. Therefore, Marathon has failed to
preserve for our review any error in the charge. Appellant's first and second issues are overruled.

c. Constructive Knowledge

In its third issue, Marathon contends the evidence is legally insufficient to show that Marathon: (1) had actual or
constructive knowledge of a dangerous condition on the premises, (2) had actual or constructive knowledge that a condition
on the premises posed an unreasonable risk of harm, and (3) did not exercise reasonable care to reduce or eliminate the risk.

If an owner or occupier has breached a statute or ordinance that was designed to prevent injury to the class of persons to
which the injured party belongs, the owner or occupier is considered negligent per se. Nixon, 690 S.W.2d at 549; El Chico
Corp v. Poole, 732 S.W.2d 306, 312 (Tex. 1987); Gonzalez v. Trinity Indus., Inc., 7 S.W.2d 303, 308 (Tex. App.-Houston
[1st Dist.] 1999, pet. denied). Both Davidson and Eftekhar testified that the applicable Dallas city ordinances were
designed to prevent injury to repairmen such as Pitzner. Davidson said that one ordinance holds the owner of the building
liable for obtaining all necessary permits and inspections. 

In support of the "knowledge" element, Pitzner relies on Davidson's testimony that the units were installed in 1985 or 1986
without a disconnect switch in violation of the Dallas city building code and ordinances, and that Marathon failed to secure
the necessary permits for their installation at that time. Pitzner argues that if Marathon had sought the permits, an inspector
would have told Marathon that safety codes prohibited it from placing the units so close together and that a disconnect
switch was required. Therefore, Pitzner contends, Marathon should be charged with constructive knowledge of the dangers
posed by the close placement of the units and the absence of a disconnect switch.

Marathon challenges Davidson's conclusion that the units were installed in 1985 or 1986 as "speculation." Davidson
testified that he determined the year from examining the serial numbers on the units and contacting the manufacturer.
Davidson's experience and qualifications in the air conditioning field were well-established. The jury was free to accept
Davidson's testimony regarding the timing of the installation of the units and the relevant code provisions in effect at that
time.

Marathon also argues that it was entitled to rely on the inspection that accompanied the "certificate of occupancy" it
received in 1991 as assurance that the building was free of dangerous conditions. However, the inspections conducted for
the certificate of occupancy did not include checking on the roof. Therefore, Marathon was not entitled to rely on the
certificate of occupancy as assurance that the roof was free of dangerous conditions.

Finally, Marathon argues that failure to comply with building codes is not evidence of constructive knowledge of premises
defects, citing McDaniel v. Continental Apartments, 887 S.W.2d 167 (Tex. App.-Dallas 1994, writ denied). In McDaniel,
the plaintiff was injured when an apartment balcony collapsed on top of her. Id. at 169. The balcony had been remodeled
and extended eight years prior in a manner that did not comply with the municipal building code. Id. The Dallas court of
appeals refused to consider the failure to comply with the building code as evidence of constructive knowledge, holding
instead that any violation of a city ordinance goes only to the issue of whether the owner exercised reasonable care to
reduce or eliminate the risk. Id. at 172.

We disagree with this holding and decline to follow it. One is charged with constructive notice of the actual knowledge
that could have been acquired by examining public records. Mooney v. Harlin, 622 S.W.2d 83, 85 (Tex. 1981). Those
residing in or having business dealings with a city are presumed to know its ordinances. Trail Enters., Inc. v. City of
Houston, 957 S.W.2d 625, 634 (Tex. App.-Houston [14th Dist.] 1997, pet. denied); Board of Adjustment of the City of San
Antonio v. Nelson, 577 S.W.2d 783, 786 (Tex. App.-San Antonio), aff'd, 584 S.W.2d 701 (Tex. 1979).

We hold the evidence is legally sufficient to show that Marathon had constructive knowledge of the relevant municipal
codes, and, from those codes, had constructive knowledge of the dangerous conditions regarding its air conditioning units.
Appellant's third issue is overruled.

d. Proximate Cause

Next, we consider Marathon's argument that the evidence was legally insufficient to show that the alleged premises defects
proximately caused Pitzner's injuries. The components of proximate cause are "cause in fact" and foreseeability. Doe v.
Boys Clubs of Greater Dallas, Inc, 907 S.W.2d 472, 477 (Tex. 1995). The test for cause in fact is whether the negligent act
or omission was a substantial factor in bringing about the injury, without which the injury would not have occurred. Id.
The foreseeability element requires proof that a person of ordinary intelligence should have anticipated the danger created
by a negligent act or omission. Id. at 478. 

Dr. Eftekhar testified that, from his observations and analysis of the scene, Pitzner "most probably" received a shock or
other surprising sensation from the air conditioning unit that caused him to reel backwards and fall off the roof. The
testimony of Eftekhar and Davidson established that the positioning of the air conditioning units and the absence of a
disconnect switch significantly increased the likelihood of a repairman receiving an electric shock while working on the air
conditioner. Appellant has not challenged the methodology or qualifications of either expert.

Appellant has argued that, from the evidence before the jury, any conclusion about the cause of Pitzner's fall would be too
speculative to survive legal sufficiency review. Proof of causation cannot turn upon speculation or conjecture. Leitch v.
Hornsby, 935 S.W.2d 114, 119 (Tex. 1996). Appellant relies primarily on two cases which present some factual
similarity,Summers v. Fort Crockett Hotel, Ltd., 902 S.W.2d 20 (Tex. App.-Houston [1st Dist.] 1995, writ denied), and
Texas Dept. of Corr. v. Jackson, 661 S.W.2d 154 (Tex. App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.). However, both
cases are distinguishable.

In Summers, a man who was last known to be on a hotel balcony eight stories up was found in a vegetative state on the roof
of a building four stories below. Summers, 902 S.W.2d at 22-23. The plaintiffs sued the hotel on the theory that the
balcony railing was unreasonably dangerous due to design flaws. Id. at 23. However, there was also evidence that the
decedent was intoxicated immediately prior to his death. Id. at 22-23. Absolutely nothing was known about what had
actually happened to the decedent on the balcony. Id. at 23. Although the plaintiffs presented expert testimony regarding
the role of the balcony in the decedent's fall, the expert admitted that he "did not know how [the decedent] got over the rail
and he could only speculate using hypotheticals." Id. at 25. The court concluded that "every piece of evidence relied on by
[the plaintiffs] to infer causation equally supports the inference that [the decedent] fell for some other reason." Id. at 26.

In Jackson, an electrical lineman received an electric shock while working to reconnect and reactivate an electrical wire on
a transformer. Jackson, 661 S.W.2d at 155. His theory at trial was that his tool belt had been defective. In this case as
well, no one saw what happened to the injured party. Id. Although the victim in this case survived, he could not remember
what happened, and "speculated" that his tool belt had slipped, causing him to instinctively reach up and grab a cross arm
and a fuse. Id. His co-workers "speculated" that the victim "probably" got too close to a hot wire. Id. at 156. If the
co-worker's speculation was correct, the defects in the tool belt asserted by the victim would have played no role in the
victim's accident. Id. at 157. The court concluded that the victim had presented legally insufficient evidence to show that
defects in the tool belt proximately caused his injuries. Id.

In both Summers and Jackson, the testimony on causation is referred to as "speculation." Summers, 902 S.W.2d at
25;Jackson, 661 S.W.2d at 157. Whether the witnesses applied this label to their own testimony, or whether it was only the
reviewing court's determination that the testimony was "speculation," is unclear.

In the instant case, the plaintiff's expert witnesses were confident of their conclusions, and only Marathon has labeled their
conclusions "speculation." Unlike in Summers and Jackson, in the instant case the plaintiff's experts were able to use facts
observed at the scene to determine the angle and speed of Pitzner's fall (backwards, at a very fast walking pace) and that
Pitzner was about to perform work that would require inserting a screwdriver at an awkward angle near a high voltage wire.
Their conclusion that Pitzner reeled backward and off the roof because he had received an electric shock is not speculative.
We conclude that Summers and Jackson are inapposite.

Marathon also relies on the testimony of its industrial safety expert, Carlton Tibbit, that Pitzner could have fallen off of the
roof because he was suffering from heat stroke. Tibbit, however, is not a medical expert. No evidence was presented
regarding the circumstances required to cause heat stroke, nor the likely effect on a person suffering from heat stroke. Nor
was any evidence presented from Pitzner's medical records to show that he was, in fact, suffering from heat stroke. Tibbit's
unsupported, lay opinion that Pitzner could have suffered from heat stroke did not so undermine the carefully supported
testimony of Davidson and Eftekhar as to render the evidence on proximate cause legally insufficient.

We hold the evidence is legally sufficient to support the jury's finding that Marathon's negligence caused Pitzner's injuries.
Appellant's fourth issue is overruled.

e. Sole Responsibility

In its fifth issue, Marathon asserts the evidence is legally insufficient to support the jury's finding that Marathon was 100
percent responsible for Pitzner's injuries. The jury was asked if the negligence, if any, of Pitzner, York, Marathon, ECSI or
Hull proximately caused the occurrence in question. The jury answered in the affirmative only as to Marathon.

If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. Formosa Plastics,
960 S.W.2d at 48; Stafford, 726 S.W.2d at 16. As noted above, there is more than a scintilla of evidence showing that
Marathon retained control over Pitzner's ability to safely perform the job Marathon required him to do, compelling Pitzner
to use a screwdriver to turn on the compressor in order to complete the task. We have held the evidence is legally sufficient
to show that Marathon proximately caused Pitzner's injuries. Therefore, there is more than a scintilla of evidence to show
that Pitzner's negligence, if any, did not proximately cause his injuries.

As to York, there is simply no evidence at all in the record that York was negligent in any manner.

Marathon argues that Hull and ECSI were negligent in their installation of the units too close together and in failing to
install a disconnect switch on the units. However, the Dallas city building code specifically provides that the owner or
lessor is ultimately responsible for obtaining all the proper permits. If Marathon had obtained the proper permits, any
negligence by Hull and ECSI would have been discovered by building inspectors and Marathon would have had to correct
these deficiencies. Therefore, there is more than a scintilla of evidence showing that Marathon's negligence alone was the
proximate cause of Pitzner's injuries. Appellant's fifth issue is overruled.

D. Venue

In its sixth issue, Marathon complains the trial court erred in denying its motion to transfer venue to Dallas County.
Appellee contends that Marathon waived its venue contest by failing to present those issues to the trial court.

1. Procedural History

The instant case was filed on August 7, 1995, just before the effective date of amendments to the venue statute. Therefore,
the law in effect on the date of filing will govern. Tex. Civ. Prac. & Rem. Code Ann. § 15.001 (Vernon Supp. 2001),
(historical and statutory notes ("A suit commenced before September 1, 1995, is governed by the law applicable to the suit
immediately before the effective date of this Act, and that law is continued in effect for that purpose.")). 

Appellee pleaded venue was proper in Hidalgo County under former Texas Civil Practice and Remedies Code section
15.037, which provided:

[f]oreign corporations . . . not incorporated under the laws of this state, and doing business in this state, may be sued in any
county in which all or a part of the cause of action accrued, or in any county in which the company may have an agency or
representative . . . .

Act of March 7, 1995, 74th Leg., R.S., ch. 4, § 1, 1995 Tex. Gen. Laws 27, repealed by Act of May 8, 1995, 74th Leg.,
R.S., ch. 138, § 10, 1995 Tex. Gen. Laws 981. (4) Appellee pleaded that York maintained an agent or representative in
Hidalgo County. The former version of section 15.061 of the civil practices and remedies code in effect at the time
provided: 

[w]hen two or more parties are joined as defendants in the same action and the court has venue of an action or claim against
any one defendant, the court also has venue of all claims or actions against all defendants unless one or more of the claims
or causes of action is governed by one of the provisions of Subchapter B [mandatory venue provisions] requiring transfer of
the claim or cause of action, on proper objection, to the mandatory county.

Act of May 2, 1983, 68th Leg., R.S., ch. 385, § 1, 1983 Tex. Gen. Laws 2119, repealed by Act of May 8, 1995, 74th Leg.,
R.S., ch. 138, § 10, 1995 Tex. Gen. Laws 981. (5)

Appellant and all the other defendants properly filed motions to transfer venue first, then filed their answers and other
pleadings "subject to" their motions to transfer venue. Marathon's motion to transfer venue was filed on September 8,
1995. A hearing on the motion was set for October 20, 1995; however, Marathon failed to appear at the hearing. On
appellee's motion, the hearing was reset for January 16, 1996. When Marathon again failed to appear, the trial court reset
the hearing for April 18, 1996.

 At the April 18, 1996 hearing, York filed a motion to withdraw its venue challenge. Hull's attorney announced that she
"declined" to argue the venue question, but asked permission to read into the record an order from the probate court of
Dallas County ordering the transfer of the instant case to that court, and ordering this case consolidated with the Pitzner
guardianship matter pending in that court. Speaking on behalf of PEG, Marathon, ECSI, and Hull, she asked the court to
"pass" the venue hearing. Appellee's counsel opposed resetting the hearing, arguing that, under the venue rules, if there
was venue as to one defendant, there was venue as to all defendants. After reconfirming that Hull's attorney did not want to
argue her venue motion, the court denied her request to pass the venue hearings as to the other defendants, and signed an
order finding that venue was proper in Hidalgo County as to all defendants.

On May 31, 1996, Marathon obtained a hearing date of June 25, 1996, to present its motion to transfer venue; a hearing for
the approval of a settlement was also set at that time. On June 17, 1996, Marathon filed a "Motion to Reconsider the April
18, 1996 Order and Brief in Support of Motion to Transfer Venue." (6) Marathon's attorney appeared at the June 25, 1996
hearing, but did not argue the motion to reconsider the venue issue. The trial court stated, "I'll review the briefs submitted
by [Marathon]. If I believe that I need something else, I will go ahead and reset - actually, give you a resetting." No further
hearing on the motion to reconsider transfer of venue was ever set by the court or requested by Marathon. The motion to
reconsider was not acted on by the trial court.

2. Standard of Review

Texas Civil Practice and Remedies Code section 15.064(b) was unchanged by the 1995 amendments. It provides that:

[o]n appeal from the trial on the merits, if venue was improper it shall in no event be harmless error and shall be reversible
error. In determining whether venue was or was not proper, the appellate court shall consider the entire record, including
the trial on the merits.

Tex. Civ. Prac. & Rem. Code Ann. § 15.064(b) (Vernon 1986). An appellate court is obliged to conduct an independent
review of the entire record to determine whether venue was proper in the ultimate county of suit: 

This review should be conducted like any other review of a trial court's fact findings and legal rulings, except that the
evidence need not be reviewed for factual sufficiency. . . . Therefore, if there is any probative evidence in the entire record,
including trial on the merits, that venue was proper in the county where judgment was rendered, the appellate court must
uphold the trial court's determinations. If there is no such evidence, the judgment must be reversed and the case remanded
to the trial court. The error cannot be harmless, according to the statute.

Ruiz v. Conoco, Inc., 868 S.W.2d 752, 758 (Tex. 1993). 

The law in Texas has long been that any party to a lawsuit may expressly or impliedly waive rights conferred upon him by a
venue statute. In the Interest of S.D., 980 S.W.2d 785, 759 (Tex. App.-San Antonio 1998, pet. denied); Grozier v. L-B
Sprinkler & Plumbing Repair, 744 S.W.2d 306, 309 (Tex. App.-Fort Worth 1988, writ denied). The matter of venue is a
personal privilege which may be waived. S.D., 980 S.W.2d at 759; Grozier, 744 S.W.2d at 309; Mooney Aircraft, Inc. v.
Adams, 377 S.W.2d 123, 125 (Tex. Civ. App.-Dallas 1964, no writ). An express waiver is shown by clear overt acts
evidencing an intent to waive, while an implied waiver occurs when a party, often inadvertently, takes some actions
inconsistent with his position on the venue issue and, therefore, is held to have waived his rights thereon. S.D., 980 S.W.2d
at 759; Grozier, 744 S.W.2d at 309.

We hold that Marathon expressly waived its motion to transfer venue by failing to present those issues to the trial court.
Marathon had an opportunity to present those issues at the April 18, 1996 hearing, but it expressly declined to do so.
Instead, it chose to rely exclusively on the Dallas County Probate Court's order to transfer. By doing so, Marathon waived
all venue issues, except those concerning the Dallas County Probate Court's order of transfer, and thereby failed to preserve
any other venue issues for appellate review. Tex. R. App. P. 33.1.

3. The Dallas County Probate Court's Order of Transfer

In its sixth issue, Marathon also contends the trial court erred in failing to transfer this case to the Dallas County Probate
Court. On April 15, 1996, just three days before the hearing on York's motion to transfer venue, ECSI and Hull obtained
the following order from Judge Nikki De Shazo of the Dallas County Probate Court, in Cause No. 9404427-P, In the
Matter of the Guardianship of John C. Pitzner, an Incapacitated Person:

ORDER


Before the Court is the Motion of Environmental Comfort Systems, Inc. d/b/a Country Refrigeration and Robert S. Hull
a/k/a "Country" Hull for Transfer and for Consolidation of Proceedings Pursuant to § 608, Texas Probate Code (hereinafter
"Hull's Motion"). After carefully reviewing the pleadings, Hull's Motion and response filed thereto, together with all
evidence presented, and having carefully heard and considered the arguments of counsel, the Court is of the opinion that
Hull's Motion should be, in all things, GRANTED.

It is therefore ORDERED that the Motion of Environmental Comfort Systems, Inc. d/b/a Country Refrigeration and Robert
S. Hull a/k/a "Country" Hull for Transfer and for Consolidation of Proceedings Pursuant to § 608, Texas Probate Code is
GRANTED. The lawsuit styled "John C. Pitzner, a Mentally Incompetent Person, By and Through His Next Friend and
Guardian Steven Pitzner v. York International Corporation, Marathon Corporation d/b/a Honda-Suzuki North,
Environmental Comfort Systems, Inc. d/b/a Country Refrigeration, Robert S. Hull a/k/a "Country" Hull, and Professional
Employer's Group, Inc. Jointly and Severally," bearing Cause No. C-3773-95-G, currently pending in the 370th Judicial
District Court of Hidalgo County, Texas is transferred to the Probate Court of Dallas County, Texas, and consolidated with
the guardianship proceedings currently pending in this Court in Cause No. 94-4427-P, as Cause No. 94-4427-P(A);

It is further ORDERED that the Clerk of the 370th Judicial District Court of Hidalgo County, Texas make up a transcript of
all pleadings and orders made in Cause No, C-3773-95-G, certify the transcript officially under the seal of that Court, and
send it with the original papers in the Cause No. C-3773-95-G to the Clerk of this Court for consolidation with this pending
guardianship proceeding.

All further relief not expressly granted herein is denied.

The version of section 607(b) of the probate code applicable to the instant case (7) defines "appertaining to or incident to an
estate" in a proceeding in a statutory probate court as including:

the appointment of guardians, the issuance of letters of guardianship, all claims by or against a guardianship estate, all
actions for trial of title to land and for the enforcement of liens on the land, all actions for trial of the right of property, and
generally all matters relating to the settlement, partition, and distribution of a guardianship estate. A statutory probate
court, in the exercise of its jurisdiction and notwithstanding any other provision of this chapter, may hear all suits, actions,
and applications filed against or on behalf of any guardianship. In a situation in which the jurisdiction of a statutory
probate court is concurrent with that of a district court, a cause of action appertaining to or incident to a guardianship estate
shall be brought in a statutory probate court rather than in the district court.

Act of May 30, 1993, 73rd Leg., R.S., ch. 957, §1, 1993 Tex. Gen. Laws 4087, amended by Act of April 22, 1999, 76th
Leg., R.S., ch. 10, 1999 Tex. Gen. Laws 29; Graham, 971 S.W.2d at 58.

Section 608 of the probate code, in effect at the time of this case, provided as follows:

§ 608. Transfer of Guardianship Proceeding

A judge of a statutory probate court on the motion of a party to the action or of a person interested in a guardianship, may
transfer to the judge's court from a district, county, or statutory court a cause of action appertaining to or incident to a
guardianship estate that is pending in the statutory probate court and may consolidate the transferred cause of action with
the other proceedings in the statutory probate court relating to the guardianship estate.



Act of May 30, 1993 73rd Leg., R.S., ch. 957 § 1, 1993 Tex. Gen. Laws 4088, amended by Act of May 20, 1999, 76th Leg.,
R.S., ch. 1431, § 2, 1999 Tex. Gen. Laws 4876 . (8) A cause of action is appertaining or incident to an estate if section 607
of the probate code explicitly defines it as such or if the controlling issue in the suit is the settlement, partition, or
distribution of the estate. In re Graham, 971 S.W.2d 56, 58 (Tex. 1998); Palmer v. Coble Wall Trust Co., Inc., 851 S.W.2d
178, 182 (Tex. 1992).

In DB Entertainment, Inc. v. Windle, 927 S.W.2d 283, 285-87 (Tex. App.-Fort Worth 1996, orig. proceeding), the widow of
a man killed in an automobile accident filed a dram shop liability action, individually and on behalf of her two minor
children, in a Denton County district court against the bar in which her husband had been drinking prior to his fatal
accident. Id. at 284. That suit was later transferred by agreement to a Tarrant County district court. Id. A guardianship
proceeding concerning the children was later filed in the Denton County Probate Court. Id. The children's mother was
named guardian, and she obtained an order from the probate court transferring the tort action then pending in Tarrant
County to the probate court pursuant to section 608. Id. at 284-85.

The Fort Worth Court of Appeals noted that, while the language of section 607 is quite broad as to the jurisdiction of
statutory probate courts, section 608 is more limited in the scope of power granted to such courts to order transfer of
matters from other courts: (9)

a statutory probate court has concurrent jurisdiction with district courts over wrongful death and survival claims brought by
someone in their capacity as a personal representative or a guardian . . . . But the determination that a statutory probate
court has jurisdiction with district courts over wrongful death and survival claims begs the question that we must answer in
this proceeding - whether a statutory probate court can transfer to itself, under section 608 of the probate code, a wrongful
death suit pending in another court so that the wrongful death suit can be tried in guardianships pending in the statutory
probate court . . . . For the following reasons, we hold that, despite a statutory probate court having concurrent jurisdiction
with district courts over wrongful death and survival claims, a statutory probate court cannot transfer to itself a wrongful
death cause of action pending in a district court to the statutory probate court under section 608:

- A wrongful death claim is not a cause of action appertaining to or incident to a guardianship estate pending in the
statutory probate court. (10)

- Section 608 lacks statutory language giving a statutory probate court authority to transfer actions by or against a person in
the person's capacity as a guardian.

- Section 608 lacks language giving a statutory probate court authority to transfer actions whether or not the matter is
appertaining to or incident to a guardianship estate.

Accordingly, in transferring the underlying wrongful death suit from Tarrant County district court to itself to be tried
ancillary to the pending guardianship proceedings, the Denton County statutory probate court lacked statutory authority,
much less discretion, to do so. . . . The transfer was an abuse of discretion.



Id. at 286-88 (emphasis added). (11) See In re Ford Motor Co., 965 S.W.2d 571, 573-75 (Tex. App.-Houston [14th Dist.]
1997, orig. proceeding) (finding the transfer of a wrongful death action by a statutory probate court to itself from a district
court was improper under former versions of sections 5A and 5B of the probate code, which are identical to the versions of
sections 607 and 608 at issue in the instant case).

Although the instant case is a personal injury cause of action brought on behalf of a living person instead of a wrongful
death and survival action, we are persuaded by the reasoning of DB Entertainment, and conclude it is equally applicable in
this case. Accordingly, we hold that the Dallas County statutory probate court lacked authority to transfer this case to itself
from the 370th District Court of Hidalgo County because under the statutes applicable to this case: (1) personal injury suits
brought by a guardian are not causes of action appertaining to a guardianship estate, and (2) the version of section 608
applicable to this matter does not give a statutory probate court authority to transfer actions by or against a guardian,
regardless of whether the action is appertaining to or incident to an estate. See DB Entertainment, 927 S.W.2d at
286-87;Ford, 965 S.W.2d at 575. Appellant's sixth issue is overruled.

E. Admission and exclusion of Evidence

In its seventh issue, Marathon complains the trial court abused its discretion "by refusing to permit cross-examination
regarding an OSHA Citation and Notification of Penalty which was issued against Pitzner's employer [Hull]." In its eighth
issue, Marathon contends the trial court abused its discretion by allowing appellee to present evidence of improvements
made to the building after Pitzner's accident.

1. Standard of Review

The admission and exclusion of evidence is committed to the trial court's sound discretion. Texas Dept. of Transp. v. Able,
35 S.W.3d 608, 617 (Tex. 2000); City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); Gee v. Liberty Mut.
Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses it discretion when it acts without regard for any
guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). 

A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment
would necessarily have been rendered, but only that the error probably resulted in an improper judgment. Brownsville, 897
S.W.2d at 753; McCraw v. Maris, 828 S.W.2d 756, 758 (Tex. 1992); King v. Skelly, 452 S.W.2d 691, 696 (Tex. 1970). A
successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the
particular evidence excluded or admitted. Able, 35 S.W.2d at 617; Brownsville, 897 S.W.2d at 753-54; GT & MC, Inc. v.
Texas City Ref., Inc., 822 S.W.2d 252, 257 (Tex. App.-Houston [1st Dist.] 1991, writ denied). In determining whether the
case turns on the evidence in question, and whether the exclusion or admission of the evidence probably resulted in the
rendition of an improper judgment, a court must review the entire record. Able, 35 S.W.3d at 617; Brownsville, 897
S.W.2d at 754; Boothe v. Hausler, 766 S.W.2d 788, 789 (Tex. 1989); Gee, 765 S.W.2d at 396.

2. Exclusion of Cross-examination

Concerning the OSHA Citation


Appellee filed a motion in limine asking that no evidence be adduced regarding the OSHA citation and penalty assessed
against Hull after Pitzner's accident for failing to provide Pitzner with a safety belt. At the hearing on appellee's motion in
limine, the trial judge stated that he would grant the motion for purposes of voir dire, but that he would reconsider the issue
when the evidence was presented. Later, when Marathon reurged its motion, the trial court stated, "I'm going to disallow
the evidence on the citation itself, but you can discuss the OSHA regulations and what they require, but not the citation." At
that time, Marathon's counsel stated repeatedly that he needed to make a bill of exception, but the trial court told him to do
it later, and that he could "do that without going into the citation."

Appellee asserts that Marathon has waived this issue by failing to make an offer of proof. However, the rules of evidence
provide that: 

[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is
affected, and 

(1) Objection. [an objection is properly made,] and 

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court
by offer, or was apparent from the context within which questions were asked.



Tex. R. Evid. 103(a). The offer of proof should be made as soon as practicable, but before the charge is read to the jury.
Tex. R. Evid. 103(a). To complain on appeal about a matter that would not otherwise appear in the record, a party must file
a formal bill of exception. Tex. R. App. P. 33.2. However, neither a formal exception to a trial court ruling or order nor a
signed, separate order is required to preserve a complaint for appeal. Tex. R. App. P. 33.1(c). 

Generally, the failure to make an offer of proof containing a summary of the excluded witness's intended testimony waives
any complaint about the exclusion of evidence on appeal. See Ludlow v. DeBerry, 959 S.W.2d 265, 270 (Tex.
App.-Houston [14th Dist.] 1997, no pet.); Sims v. Brackett, 885 S.W.2d 450, 453 (Tex. App.-Corpus Christi 1994, writ
denied). However, when the substance of the evidence is apparent from the record, a formal offer of proof may not be
necessary. Tex. R. Evid. 103(a); Akin v. Santa Clara Land Co., Ltd., 34 S.W.3d 334, 339 (Tex. App.-San Antonio 2000,
pet. filed). When the record is sufficient to show an informal offer of proof was made, the issue is preserved for appellate
review. Sims, 885 S.W.2d at 453. 

Marathon never made a formal offer of proof or formal bill of exception regarding the citation and notification of penalty,
but it is clear from the record that the substance of the evidence in question is a citation issued to Hull by OSHA for failing
to supply Pitzner with a safety belt on the day of the accident. We hold that Marathon has not waived this issue.

At trial, portions of Hull's deposition were read into the record. In one such portion, Hull testified that he had safety belts
available for Pitzner to use. Davidson testified that the safety belt is a harness with a rope or wire that must be attached to
something. Davidson and Eftekhar both testified, however, that there was nothing on the dealership roof to which a safety
belt could be attached. Photographs of the roof indicate a flat surface with air conditioning units, electrical cables and a
two-inch gas line. The discussions between the trial court and counsel regarding the OSHA citation also indicate that Hull
had said he did not feel he deserved the citation and penalty, but he paid it rather than contesting it.

Evidence must be relevant in order to be admissible. Tex. R. Evid. 401, 402. Relevant evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
jury. Tex. R. Evid. 403. In light of the evidence that there was no place on the roof where such a safety belt could be
attached, we hold the trial court did not abuse its discretion by excluding evidence of the citation and penalty, and any
cross-examination thereon.

Furthermore, even if the trial court had abused its discretion, it is unlikely, in light of the evidence regarding the lack of an
attachment point for such a belt, that the exclusion of evidence regarding the OSHA citation probably resulted in the
rendition of an improper judgment. See Able, 35 S.W.3d at 617; Brownsville, 897 S.W.2d at 754; Boothe v. Hausler, 766
S.W.2d 788, 789 (Tex. 1989); Gee, 765 S.W.2d at 396. Appellant's seventh issue is overruled.

3. Evidence of Subsequent Improvements

In its eighth issue, Marathon contends the trial court abused its discretion by allowing appellee to present evidence of
improvements made to the building after Pitzner's accident. Marathon sought to preclude admission of evidence
concerning subsequent changes to the rooftop in its motion in limine. The trial court initially granted the motion, but
denied it when the appellee sought to introduce the evidence at trial.

Generally, evidence of subsequent remedial measures is not admissible to prove negligence or culpable conduct in
connection with the event. Tex. R. Evid. 407(a). The purpose of this rule is to exclude such evidence so as not to
discourage parties from taking safety measures. Huckaby v. A.G. Perry & Son, Inc., 20 S.W.3d 194, 207 (Tex.
App.-Texarkana 2000, pet. ref'd); E.V.R. II Assocs., Ltd. v. Brundige, 813 S.W.2d 552, 556 (Tex. App.-Dallas 1991, no
writ). However, evidence of subsequent remedial measures is admissible when offered for another purpose, such as
proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment. Tex. R. Evid. 407(a). 
 

However, we conclude that the evidence in question is not about subsequent remedial measures. Leos testified that in 1995
the interior of the building was enlarged. Bowman testified that in 1995, they added more air conditioning "tonnage" as
Hull recommended. Davidson opined that the new units installed by Hull on the dealership roof in 1995 were still in
violation of multiple provisions of the building code, in part because they had no disconnect switch and because no city
permit was ever issued for their installation. Because the same code violations existed after the changes in the air
conditioning system, the changes cannot be considered "remedial." Furthermore, the evidence impeached Hull's testimony
that he always put disconnect switches in any new units he installed, and that he could not, therefore, have installed the
units Pitzner was working on. We hold the trial court did not abuse its discretion in admitting this evidence. Appellant's
eighth issue is overruled.

F. Settlement Credit

In its tenth issue, Marathon contends the trial court abused its discretion by refusing to allow an offset for settlement
credits. Appellee concedes that Marathon should have received some settlement credit, but disputes which method of
calculating the credit was elected by Marathon.

The relevant statutes provide:

§ 33.012 Amount of Recovery

* * * * *

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be
recovered by the claimant with respect to a cause of action by a credit equal to one or the following, as elected in
accordance with Section 33.014:

(1) the sum of the dollar amounts of all settlements; or 

(2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact:

(A) 5 percent of those damages up to $200,000;

(B) 10 percent of those damages from $200,001 to $400,000;

(C) 15 percent of those damages from $400,001 to $500,000; and

(D) 20 percent of those damages greater than $500,000.



* * * * *



§ 33.014 Election of Credit for Settlements

If a claimant has settled with one or more persons, an election must be made as to which dollar credit is to be applied under
Section 33.012(b). This election shall be made by any defendant filing a written election before the issues of the action are
submitted to the trier of fact and, when made, shall be binding on all defendants. If no defendant makes this election or if
conflicting elections are made, all defendants are considered to have elected Subdivision (2) of Section 33.012(b).

Tex. Civ. Prac. & Rem. Code Ann. §§ 33.012, 33.014 (Vernon 1997). When there is a settlement covering some or all of
the damages awarded in the judgment, section 33.012 requires the trial court to reduce the amount accordingly. Mobil Oil
Corp. v. Ellender, 969 S.W.2d 917, 926 (Tex. 1998). The only question is by what amount the trial court should reduce
the judgment. Id.

On September 16, 1997, Marathon filed a written election of credit for settlements choosing section 33.012(b)(1), the
dollar-for-dollar credit. Marathon claims, however, that it verbally changed its election to the section 33.012(b)(2) method.
However, the only statement in the record that might reasonably be construed as referring to the settlement credit election is
the following statement made by Marathon's trial counsel to the trial court at the charge conference held on December 9,
1997:

Counsel: Now, I am still reserving my right to whatever offset and credit which I may be entitled to for the amounts that
[the other original defendants] paid, but that's not an issue that has anything to do with anything --

The Court: Right.

Counsel: -- we need to do for a jury --

The Court: For the jury.

Counsel: -- submission. That will be an issue upon entry of judgment. It can be taken up at that time.

The Court: Right . . . We'll do it that way. We'll take it up later on. Okay.

We do not consider this statement to be an election of the section 33.012(b)(2) option. The statement could refer equally to
the section 33.012(b)(1) option. Even if appellant could be said to have made a verbal election, it filed no written election
changing the method of settlement credit to the section 33.012(b)(2) option. Furthermore, in its Objections to Plaintiff's
Motion for Judgment on the Verdict, filed on December 19, 1997, Marathon asserted it was entitled to a dollar-for-dollar
amount.

The language of section 33.014 is clear and unambiguous: a nonsettling defendant may elect either method of settlement
credit. Its choice "shall be made by a written election." Section 33.012(b)(2) will be considered elected if (1) no written
election is filed, or (2) conflicting elections are made. Marathon has cited no caselaw, and we can find none, in which a
defendant was permitted to verbally change his settlement credit option. We hold that the written election choosing the
section 33.012(b)(1) dollar-for-dollar credit is the valid election, and we will apply it accordingly.

A defendant seeking a settlement credit has the burden of proving its right to such a credit. Mobil Oil, 968 S.W.2d at
927;First Title Co. v. Garrett, 860 S.W.2d 74, 78 (Tex. 1993). A party can meet this burden by placing the settlement
agreement or some evidence of the settlement amount in the record. Mobil Oil, 968 S.W.2d at 927; First Title, 860 S.W.2d
at 79. Placing the uncontested settlement amount in the record by informing the trial court of the amount in open court, or
in a written opposition to a motion for judgment, will suffice to meet the burden. Mobil Oil, 968 S.W.2d at 927.

Appellee asserts that the credit should be for $600,000, citing the following statement by appellee's counsel at a pre-voir
dire conference on December 2, 1997:

Counsel: But in terms of the [settlement] money, I don't think he told you that, but I'll be clear, it was $200,000 per
defendant or, more or less, that's the way it works out at, we're faced with $350,000 past medical damages and mounting.

In its brief, Marathon asserts, in the alternative, that the trial court abused its discretion in denying Marathon's request for
post-verdict discovery as to the total amount of the settlement. In its "Objections to Plaintiff's Motion for Judgment on the
Verdict," Marathon requested an opportunity to discover the actual amount of settlement money received by appellee, and
stated that it:

was aware of at least $405,000 being paid by settling Defendants. Counsel for Plaintiff stipulated during voir dire and
again during opening statements that at least $600,000 had been paid by the settling Defendants. In addition a sum
uncertain was paid in an attempt to settle with Plaintiff's employer under that employer's ERISA Plan. Since an ERISA
Plan, unlike a policy of worker's compensation insurance, is not exempted from the Texas Civil Practice and Remedies
Code credit provisions, [Marathon] is entitled to discover the amount payed [sic] through that plan and obtain a credit
against same to be deducted prior to calculations of any amounts owed or interest due.



The clerk's record shows that PEG settled with appellee for $205,000. The clerk's record also shows that York, ECS and
Hull settled with appellee, but does not reveal the settlement amounts. Because it was entitled to a credit for the entire
amount of settlement, we hold the trial court erred in refusing to allow Marathon to discover the total amount of all
settlements received by appellee.

Because appellee conceded that Marathon was entitled to a settlement credit, we abated this case to the trial court to
determine the total amount of all settlements received by appellee. The trial court subsequently signed an order in which it
found that the total amount of all settlements received by appellee was $700,000. The supplemental record includes a copy
of the trial court's order.

Accordingly, we hold that appellant is entitled to a dollar-for-dollar settlement credit of $700,000. We sustain appellant's
tenth issue.

G. Prejudgment Interest

In its eleventh issue, Marathon asserts the trial court erred in its calculation of prejudgment interest. Appellee concedes this
issue.

Under the version of the finance code in effect at the time of this judgment, prejudgment interest begins to accrue on the
earlier of (1) 180 days after the date a defendant receives a written notice of a claim or (2) the date suit is filed. Act of June
3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51 (current version at Tex. Fin. Code Ann. § 304.104 (Vernon
Supp. 2001)); Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 531 (Tex. 1998). Prejudgment
interest accrues as simple interest at the rate of ten percent per annum. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1,
1987 Tex. Gen. Laws 51 (current version at Tex. Fin. Code Ann. § 304.103 (Vernon Supp. 2001)); Johnson & Higgins, 962
S.W.2d at 531. Prejudgment interest accrues until the day preceding the date judgment is rendered. Act of June 3, 1987,
70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51 (current version at Tex. Fin. Code Ann. § 304.104 (Vernon Supp.
2001)).

The record establishes that this case was filed on August 7, 1995, and that the 180th day after appellant first received notice
of this claim was April 22, 1995. We conclude that prejudgment interest in this case runs from April 22, 1995 until
January 22, 1998, the day preceding the date of the judgment, at the rate of ten percent per annum. We hold the trial court
erred in its calculation of prejudgment interest. We sustain appellant's eleventh issue.

H. Conclusion

Because we have held that appellant is entitled to a dollar-for-dollar settlement credit of $700,000.00, and that the trial
court erred in its calculation of prejudgment interest, we modify the trial court's judgment as follows:

John Pitzner, a mentally incompetent person by and through his next friend and guardian, Steven Pitzner, is granted
judgment and shall recover from Marathon Corporation d/b/a Honda-Suzuki North actual damages in the amount of
$5,245,500.00, (12) together with prejudgment interest thereon at the rate of ten percent per annum from April 22, 1995 until
January 22, 1998, all costs of court, and postjudgment interest at the rate of ten percent per annum from January 23, 1998
until paid.

As modified, the trial court's judgment is affirmed.




FEDERICO G. HINOJOSA

Justice




Publish. Tex. R. App. P. 47.3.

Opinion delivered and filed this the

2nd day of August, 2001.

1. We acknowledge that an appellate court may suspend a rule's operation in a particular case "to expedite a decision or for
other good cause." Tex. R. App. P. 2. However, Rule 2 does not permit this Court to suspend the rules to correct errors
that occurred in the trial court. Jauregui Partners, Ltd. v. Grubb & Ellis Commercial Real Estate Serv., 960 S.W.2d 334,
336-37 (Tex. App.-Corpus Christi 1997, pet. denied). 

2. In its brief, appellant claims "Eftekhar admitted that Pitzner had the option to tie the two low voltage wires together to
charge the unit with Freon." We do not agree with appellant's characterization of this testimony. The relevant passage states:

Q: . . . all he needed to do was tie the low voltage wires together and charge it with freon, if, in fact, that was correct, then
none of this matters anyway, there would be no reason for that [Pitzner being shocked while pushing the contactor] to have
occurred, correct, sir?

A: That was an option, but I don't believe that's what he did, because the air conditioning was not working. Therefore, it
was shut off from the thermostat from downstairs. So the only thing he had to do was push this bar that I talked about.

We understand Eftekhar's testimony to be that, because the thermostat had been switched off inside the building, the only
way Pitzner could charge the unit was to push the contactor. Davidson also testified that, if the thermostat was turned off,
the only way to activate the unit is to reach inside the access panel and push the contactor.

3. Marathon challenges Eftekhar's conclusion that Pitzner was falling backward, referring to evidence that Pitzner received
injuries on the front of his head. Pitzner received injuries on both sides of his head and torso. Eftekhar concluded that the
injuries on Pitzner's back indicated that he had fallen backwards. Marathon's assertions regarding injuries on Pitzner's front
may have lessened the weight and credibility of Eftekhar's testimony, but did not prevent the jury from accepting Eftekhar's
testimony that Pitzner fell backwards.

4. Under current law, the provision for venue in a county where a foreign corporation has an agent or representative has
been eliminated. See Tex. Civ. Prac. & Rem. Code § 15.002(a) (Vernon Supp. 2001). 

5. This provision remains essentially unchanged in the current venue statutes. See Tex. Civ. Prac. & Rem. Code § 15.005
(Vernon Supp. 2001).

6. We note that after the trial court's decision on a motion to transfer venue, "no further motions to transfer shall be
considered regardless of whether the movant was a party to the prior proceeding or was added as a party subsequent to the
venue proceedings, unless the motion to transfer is based on the grounds that an impartial trial cannot be had under Rules
257-259 or on the ground of mandatory venue, provided that such claim was not available to the other movant or movants."
Tex. R. Civ. P. 87(5). Thus, Marathon's "Motion to Reconsider Transfer of Venue" was not proper under the rules, and a
hearing should not have been granted.

7. The current version of section 607(b) was amended effective September 1, 1999, to add the following language at the
end of the second sentence: "all such suits, actions, and applications are appertaining to and incident to an estate." Tex.
Prob. Code Ann. § 607(b)(Vernon Supp. 2001).

8. Section 608 was amended effective September 1, 1999. The current version is identical except for the addition of a
provision enabling a statutory probate court to transfer to itself a cause of action in which a personal representative of an
estate pending before it is a party. See Tex. Prob. Code Ann. § 608 (Vernon Supp. 2001).

9. The Fort Worth court was construing the same versions of sections 607 and 608 that apply in the instant case.

10. Citing Tex. Prob. Code Ann. § 607(b)(Vernon Supp. 1986); Palmer v. Coble Wall Trust Co., Inc., 851 S.W.2d 178,
181 (Tex. 1992); Seay v. Hall, 677 S.W.2d 19, 23-24 (Tex. 1984) (holding that, under an earlier version of the probate
code, a statutory probate court did not have jurisdiction over a wrongful death and survival action filed in that court by the
representative of a decedent's estate). 

11. We note that the amendments to sections 607 and 608 of the probate code, as noted above, might change the outcome
of this issue. However, we are bound to apply the law in effect at the time this motion to transfer was filed. See Tex. Prob.
Code Ann. § 608, hist. and stat. notes (Vernon Supp. 2001) ("This [amendment] takes effect September 1, 1999, and
applies only to a motion to transfer a cause of action filed on or after that date. A motion to transfer a cause of action filed
before the effective date of this [amendment] is governed by the law in effect on the date the motion was filed, and the
former law is continued in effect for that purpose.").

12. $5,945,500 - $700,000 = $5,245,500.